14-1275, Sierra Club et al Petitioners v. Federal Energy Regulatory Commission. Mr. Matthews for the Petitioners, Mr. Solomon for the Respondents, and Mr. Franklin for the Intervenors. Thank you again, Nathan Matthews, this time on behalf of Petitioners, Sierra Club, as well as Galveston Baykeeper. And again, I would like to reserve five minutes for rebuttal. I'd like to begin by reiterating that the purpose of the projects authorized by FERC in Freeport, as well as in City of Madison, is solely to enable the export of natural gas. These are not facilities that are being constructed that will have an incidental effect of enabling or facilitating future exports. That is the sole purpose of the facilities at issue here. And the Freeport facility, Intervenors has indicated that it's a $13 billion project. It's a massive investment with the capacity to export natural gas equivalents to more than 2% of the Energy Information Administration's estimate of baseline domestic natural gas production. So this is a facility that serves no purpose other than enabling the export of natural gas. There's been a significant commitment of resources enabled by the FERC decision here, despite the fact that there's not yet a final or appealable order from the Department of Energy regarding this facility. And the scale of this facility when measured against the overall domestic gas landscape is quite large. Can you start with what... I'm sorry to take you back where you don't like to be, but standing. Your brief, opening brief, doesn't even mention standing. And I think you should believe you're likely to have a burden if you would make a complaint to establish standing. And not just to allege it, mind you, but to establish it at some adjustment level of evidence. And you just didn't do it at all until your reply brief, at which point they don't have any chance to respond to that in briefing. What are we supposed to do with that? We attached declarations for opening brief... I understand you attached those, but I mean, if you're normally a party, you're supposed to argue it. We're not supposed to go ahead and argue it. So our discourse decision in Citizens Against Runway Expansion versus the Federal Aviation Administration summarized cases by this court holding that the rule, that when standing is self-evident on the basis of the record, the rules of Circuit Rule 28 or of CERECO versus EPA do not apply and that the party... What if it's not self-evident? The participants reasonably understood their standing to be self-evident in this case, where our members live near the facility and will suffer impacts that the environmental impact of the statement itself identified as significant. The EIS states that the report project will have significant impacts in terms of lights, noise, also vibration, I believe, on members or on CERECO members specifically, but on residents of Quintana and on folks living and recreating near the facility. All right. So in American Library Association versus SEC, we made clear that the court could inquire at any time and that in previous cases we've allowed where the petitioner proceeded in good faith to think it was self-evident to submit affidavits or even supplemental affidavits and declarations to establish standing. So that's what you've attempted to do, I gather. There's a lot... As I understand that case and the other circuit, the court allowed submission of affidavits later than the opening in the reply where evidence appeared for the first time. And here, you know, we're not asking to be allowed to introduce new evidence in the reply. We explained the factual basis for our understanding in the opening brief or in the declarations attached to the opening brief. And again, because our members were complaining of injuries that FERC itself had identified as being significant environmental effects, we understood our standing to be self-evident. So... So our understanding was that because our standing was self-evident that we were not required to further brief standing either by Circuit Rule 28 or by... But I think to close the loop here, you at least have to show what, for example, that if it misses all of them, their standing. Right. Oh, and I mean, again, because our members have testified that they live and recreate near the facility, that they will have their environment of the beaches near the facility, but also in their homes adversely impacted by the noise, light, vibration from the project, that the project injures our members in a way that this court recognizes as sufficient basis for standing in diminishing residence case and other cases on aesthetic injury. Where does Ms. Olin say she's going to visit less frequently? Visit Quintana less frequently? I believe that she testified both that she'll visit less frequently, but also that when she does visit, her enjoyment of the facility or of the beaches will be diminished. And I recognize that you... I'm just concerned about what's going on, but I don't actually see her saying anywhere that she's going to change her behavior. And then we got Mr. Hershey who's talking about a pipeline that I don't think is relevant here. So, Mr. Hershey is... I think he said he had affidavits that were self-evident. I'm just wondering what he did. So, I think one answer to your question is that our view of this circuit's case law and the Supreme Court's standing case law is that a change in behavior is not required to demonstrate standing. That, you know, for example, if a member is going to have loud noise from piledriving for construction of this facility, just disrupt their life at their home, that's an injury for purposes of standing regardless of whether or not that noise is so bad that it causes the person to spend less time at their home or move or something. That sort of quality of life injury is itself sufficient to demonstrate standing without any change in behavior. And our members, Melanie Oldham and Teresa... We have two recreational members who live or spend significant time on Quintana Island who have that type of aesthetic and recreational injury. Michael Hershey is a separate case because he lives near a pipeline that would be constructed solely to serve... where the explicit purpose of that pipeline would be to serve the Freeport Export Project. But I don't believe that we need to get into the injuries because the declarations from members who are adjacent to the facility itself provide a sufficient basis for standing. All right, moving on. So, again, I mentioned that this is a large infrastructure project whose sole purpose is to enable the exports of natural gas. And there's a large body of NEPA case law regarding NEPA review of infrastructure projects. And in many cases, for example, a NEPA case concerning a bridge or a highway that will enable development in a location that otherwise was inaccessible or was less accessible, the courts have held that the fact that that infrastructure development of access makes development of that area easier and more effective, means that the induced growth of additional buildings, say, building on an island that you couldn't get to before the bridge was built... How do you respond to Mr. Franklin's point about foreseeability? That the very nature of the market here means that you're not going to be able to know where these things come from. It's just too speculative. I have several responses to that. One is that the gas will have to come from somewhere. And to the extent that there's uncertainties to how much of the gas will come from new gas production, then the balance will need to be made up by a reduction in gas consumption. And so the precise ratio of new gas production to increased pollution may be something where reasonable minds could differ. But it's clear it has to be some combination of both. The question about not knowing where gas production will occur is, first of all, irrelevant for purposes of the greenhouse gas analysis. There's been nothing in the records that indicates that you would need any information about where the additional gas production would occur before you could conduct a meaningful analysis of the greenhouse gas emissions resulting from that production. Do you have cases that support that view? Besides mid-states? Well, I don't believe mid-states concern greenhouse gases at all. No, no, but the general idea that you just don't need to know where it comes from. It's just that it's happening. Well, so for purposes of not needing to know where it comes from and just that it's happening for purposes of the greenhouse gas analysis, we point to EPA documents explaining that because greenhouse gases are well-mixed and long-lived in the atmosphere, that those impacts did not depend on knowing where they are. Right, right. But we also think that the record clearly indicates that it is possible to foresee where this production will occur. In particular, the Energy Information Administration study is built upon the National Energy Modeling System, which includes a regional breakdown of gas production in the United States and divides the lower 48 states into six different regions, and that the documentation of that model, which we call the FERC's attention in the record here, demonstrates that EIA can predict not just that production will occur, but where among those regions additional production will occur. And FERC has not provided any reason for concluding that those regional estimates on where production will occur are an insufficient basis for analyzing the ozone impacts of these projects. As we mentioned and as demonstrated by documents in the record, ozone is a regional pollutant that affects – ozone emissions can affect multi-state areas, and so just the regional predictions provided by the National Energy Modeling System would provide an adequate basis for conducting an analysis of the ozone impacts of the additional production that would be induced by these projects.  By the siting of where export facilities occur, earlier on I noted that the impacts of a gas facility – export facilities located in the Gulf are likely to be different than the impacts of a facility located on the state of the Oregon coast, which are also two proposals pending for Oregon facilities, and that it is likely that a facility located in the Gulf is likely to induce additional gas production in Texas or along the east coast, whereas an Oregon facility would be more likely to induce additional gas production in the mountain west. And that likelihood can be tested using – Why is that – I'm just not scientific. Why is that more likely? Because it's a shorter pipeline distance. Is it too much for gas? The way gas moves, does it matter? Well, the – you know, FERC's statements in the record here are that because of the nature – interconnected nature of the pipeline network, that gas processed by the Freeport or the Sabine Pass project, as far as we're talking about just the increment for Sabine Pass, could come from anywhere in the Gulf or the eastern United States. But the FERC's own statements reflect the fact that although there's a large interconnected pipeline network, there are fewer connections between the mountain west and the Gulf. But those are not issues that FERC needs to speculate on because the Environmental Information Administration has a modeling tool that would let FERC predict or take an analysis of are exports from the Gulf likely to change gas production in different regions than wood exports from Oregon. Is there any reason – I just don't know. Is there any reason to think that where the gas comes from is relevant in analyzing what the environmental consequences of its production are? Is it – Yes. Is it simply because it's harder to get it out to others? Do you think we do need to know where it's coming from to do this analysis? Well, it certainly has a potential impact to the analysis of ozone because ozone is a regional impact. And so if there's additional gas production happening in an area that's already suffering heavily impacted ozone levels, the marginal contribution to ozone because of the additional gas production could cause a bigger public health consequence than if that gas production was coming at some place that had a little more headroom and didn't have as bad of regional ozone impacts. And so – But wouldn't the – I mean, that might affect what the EPA is doing under attainment areas or non-attainment areas. But for NEPA, does it matter whether there's a high ozone level or not? Wouldn't they want to figure out – is your position they should just – whether it's coming in a place that has perfect, pristine, clear air or a very smoggy city, we need to – NEPA needs to measure what the impact of this increased production is on the air. Yes. Yes, our position is that NEPA requires not just an analysis of how many tons of pollution are going to come out of a project, but what the impact those tons of pollution are going to have. And I don't believe that FERC disagrees with that in any way. It's demonstrated by FERC's environmental review of the local and direct impacts of these projects here. FERC, in reviewing these projects, hasn't just said there'll be X tons of nitrogen dioxide pollution and Y tons of volatile organic chemicals. FERC then proceeds to talk about the context of the surrounding area and the impact of those emissions in the particular areas where it will occur, including referring to whether or not those impacts will or won't cause a violation of EPA's air quality standards. And one of the requirements for environmental impact statements provided by the NEPA regulations is to assess the extent to which actions will or won't cause violations of applicable environmental standards, including other agencies' air quality standards. And so it's not that FERC can say we don't care about ozone because ozone is EPA's problem. It's the reverse. EPA has designated that ozone is a problem and that triggers an obligation for FERC to think about whether FERC's actions will cause ozone levels that violate EPA's standards. And that's true regardless of whether we're in the non-attainment context where there's a Clean Air Act conformity determination or just the general NEPA analysis. I'd like to return to the discussion of other cases concerning infrastructure projects and that, again, it's the norm rather than the exception for agencies reviewing infrastructure such as building a bridge to have to consider the effect of the additional growth that will be enabled or facilitated by that project. And that's, you know, in those cases, there's generally no direct regulatory authority over that induced growth. The regulations specifically call for an analysis of induced growth, but there will be very, very few cases, if any, where the agency that is acting in a way that will induce growth also has direct regulatory over the growth itself. Why isn't the better place to raise all these arguments about the consequences of exporting all this gas? And a challenge to DOE is modernization of export. Why can't you do it there? Why isn't that the better place to do it? So I have two answers to that. One is that NEPA imposes... Although NEPA provides a framework for interagency cooperation, every agency has an independent obligation to ensure that the impact has fully been considered. And so NEPA doesn't require a challenge to be made at the best place or at the agency that is the most direct authority. NEPA provides an opportunity and a right to challenge any agency's action that will lead to an indirect effect. But there's a pragmatic reason as well, which is that FERC is going first, that there is not yet an appealable order from the Department of Energy regarding exports from the Freeport project, but the FERC has already authorized construction and investment and commitment of resources to this project. The environmental consequences of that construction are not what you're objecting to for purposes of this case. You're objecting to the increased production, which isn't going to happen until there's a DOE order, correct? That's correct. You don't have anything to worry about until there's a DOE order and then just challenge it there. The NEPA regulations regarding interagency cooperation and even the single agency action clarify that it's important for environmental effects to be analyzed at the earliest possible time and before there's been any commitment of resources. That's their problem. They have to commit all these resources and then they don't get the order out of DOE because DOE does the Your Dream NEPA analysis and says we're not going to authorize it. That's their problem. The environmental costs aren't happening any earlier. They just don't happen until there's an export. Well, I would disagree. The NEPA regulations explicitly call for consideration of environmental effects by agencies before there's any action that causes a commitment of resources. I believe the policy behind that is that once there has been a commitment of resources, it has the potential to influence the agency's later decision making. The regulations themselves clearly require early and broad commitment of environmental impacts before any other decision making has been made. Have challenges been by you or by anyone else ever been made to one of these export decisions by the Department of Energy? Has there ever been a NEPA challenge to their export decision making and NEPA's role in their NEPA analysis and their export decision making? I don't believe that there has been any reported case  to any of the Department of Energy. Why not? There haven't been very many. Okay. And the Department of Energy has been on a schedule that's significantly behind FERC in these proceedings. The Natural Gas Act does not provide a right for judicial review until the agency has acted to deny a request for a re-hearing. In... Do you have a re-hearing position? We have a re-hearing position pending before DOE regarding DOE's authorization for Freeport. There's not yet a DOE decision regarding the Sabine increment of the additional $200 billion per year for us to even seek a re-hearing of much less a denial of a hearing that we could not appeal to this court. And the re-hearing position still has... I know the briefing said it hadn't been acted on. Is it still not been acted on in this case? It has not. We followed that re-hearing request with the Department of Energy in December of 2014 and DOE has only acted on it by issuing an order saying that DOE will take additional time extending the statutory 30-day deadline. So we are continuing to wait for an appealable order there. But then you'll be able to make... assuming they make a decision you disagree with, you'll be able to make all the arguments there that you're making here? We will be able to make many of the arguments. We also have an argument challenging the Freeport project for first failure to consider the indirect effects of the electricity that will be consumed by the project itself which is not an issue that's within... Okay. Other than that argument all your concerns about the environmental impact, the global warming impact, the production of whether it's more gas leading to produce more coal, all those things you can raise in the Department of Energy decision if need be? I see that I'm out of time but if I can answer your question. We have raised similar issues in our request for a hearing for the Department of Energy. Is there anything other than the electrical power thing that you can't raise then? We can't raise the fact that there will have been a commitment of resources prior to adequate NEPA review. So when we challenge the Department of Energy decision there won't have been an investment or disturbance on the ground that might act as a thumb on the scale that would prevent the agency from properly considering. I assume if they were to rely on that you would go hang on, you can't have your cake and eat it too, you sit over here, first sit over here and we can't talk about export consequences. We tried to but they wouldn't look at it so you can't now say it's probably too late and we can't really take it into account. The concern underlying the NEPA requirement to consider environmental impacts at the earliest possible time and before any resources is that those commitments will be a thumb on the scale not that it will be a factor that the agency will be explicitly relied upon but that Congress in enacting the Council on Environmental Quality and promulgating NEPA regulations recognize that regardless of what's in the reasons given in formal agency decision making documents that the agency's process of making decisions has the potential to be influenced by commitments of resources that have already been made or simply by decision making momentum and so the statute and the regulations reflect a policy judgment that in order to avoid the potential for that sort of a bias or a thumb on the scale that decisions need to be made at the earliest possible time. Let me ask you and I may be incorrect but in one of the cases the Department filed an addendum and a greenhouse gas study but saying it didn't need to do that so is that in this case or the state line case? It's not in the administrative record in either case. The Department of Energy didn't file that. The Department of Energy has done nothing about the greenhouse gas study so insofar as that's an action the DOE took it's relevant to Freeport. So hasn't the DOE done anything about that? I'm not sure. I'm not sure.         of Energy has done nothing about that. I'm not sure. I'm not sure. I'm not sure. I'm not sure. My first response would be that we're challenging FERC's decision. is that the Department of Energy reserve the right to reject what the department think is required. But it's already indicated that it doesn't think it is required to do certain things. That's correct. The Department of Energy has indicated that it does not believe any further analysis is required. And that indication is both in the environmental addendum that DOE released. We also have DOE's opinion that DOE did not believe it needed to consider these effects. So following up on Judge Millett's question, you have this rehearing order. And suppose on rehearing the Energy Department says given the congressional obligation at least as to non-free trade countries, our responsibility is to do the analysis you want. I understand your argument is it's first duty, first of all, to  So I just want to explore where, in other words, if you're closed down here, there's no guarantee that you're going to have an opportunity later, although counsel for intervener said you would. As I understood intervener's argument. Assuming that the Department of Energy denies or pending requests for rehearing, we will have an opportunity to seek review of that denial of rehearing. As I mentioned, that does not provide all of the same opportunities for relief. There's an important issue in this case which is not present before the Department of Energy, but also because of the fact that here our concern is that FERC has violated the obligation to consider the full range of requirements for rehearing. I do see that I have overtime. Let me just ask you here again. You can't get out that easy. Not after what we've been through. At least as to the electric usage requirement, maybe we don't have jurisdiction. Because you didn't raise it on your hearing. I confess to being somewhat confused by their argument that we did not raise it on our hearing. I believe we did. You didn't raise it as to how they characterized it. In our comments on the draft environmental impact statement we argued that was an important issue that had been entirely omitted from analysis and that FERC needed to consider it. FERC then provided  although inadequate consideration of that issue. As I understand FERC's argument because we did not anticipate the partial flaws in the way they presented their analysis in response to our comment, we can't challenge their twisting of the requirement to present issues before the agency and to exhaust issues before appeals. Clearly understood that we raised the effects of additional electric production as an issue. I believe our request for a hearing to FERC also flagged the nature of our concern with the way FERC responded to that comment. Our request for a hearing explained our concern that FERC failed to juxtapose the indirect effects of electricity production with the no action alternative. I believe that FERC did not make it clear that the effects from electricity  were much greater than the direct effects from the project itself. Our concern is that our concern is that our concern is that our concern is that the indirect effects of the project will be a massive increase in electricity   that electricity will have consequences. And that FERC needs to consider the effects of that electricity and the indirect effects of the project itself. We clearly flagged that FERC needed to compare the effects of the project against the no action alternative. We did point to the database as being a tool that FERC could use to compare the effects of the project against the indirect   project. We did point to the database as being a tool that FERC could use to compare the effects of the project     We did point to the database as being a tool that FERC could use to compare the indirect project against the indirect project. We did point to the database as being a tool that FERC could  to  the project  the indirect project. We did point to the database as being a tool that FERC could use to compare the project against the     point to the database as being a tool  FERC could use to the project against the  project. We did tool FERC could use as being the database for the employment for the project. That completes the  Thank you.  any changes in the presentation? Did any of the analysis include any of the studies? I would assume not. The authorization is automatic. I'm not sure to which extent it refers to . It is a document that the FDRC prepared. And it prepared the life cycle greenhouse gas study from the perspective of the importing countries. But it took the position it had no obligation to do those studies. Yes, and we agree with that. Where FERC is the lead agency on environmental matters, and I'll focus on the trade countries, FERC is saying it has no obligation to do these types of studies. Then the what I'll call the complete environmental analysis required under NEPA is not done unless FERC does it. The complete analysis under NEPA was done by FERC for FERC's responsibilities. What we're trying to get at is Congress set up this scheme, and the tricky part is this free trade country. It just bypasses energy. And the whole point has been argued FERC has no obligation to do anything more than the impact of the facility itself as FERC interpreted its obligation in the E.A. And here in the E.I.S. And nobody ever gets to look at what everyone has been saying, oh, that can be addressed in a challenge to the Department of Energy. And the Department of Energy will come back and say Congress said it's a free trade country. Basically, we  No, I believe the Department of Energy does have role. Again, it is difficult with respect to the E.A.S. But the Energy Department has already said it has a legal responsibility          already said it has a legal responsibility to address these issues. And the Department of Energy has already said it has a legal responsibility to address these issues. And the Energy Department has already  has a legal responsibility to address these issues. And the Energy Department has already said it has a legal responsibility to    And the Congress  already said it has a legal responsibility to address these issues. And the Congress has already said it next floor . Thank you.
judges: Rogers, Griffith, Millett